[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No.  11-11670
_____

D.C. Docket No. 3:10-cv-00422-TJC-JRK

MARK F. BAILEY, GAY L. BAILEY,
STEVEN R. BREDAHL, ANDREA P. BREDAHL,
DAVID JANKOWSKI, KEVIN CRAWFORD, et al.,

Plaintiffs-Appellants,

versus

ERG ENTERPRISES, LP,
LUBERT-ADLER MANAGEMENT COMPANY, LP,
LUBERT-ADLER REAL ESTATE FUND III, LP,
LUBERT-ADLER CAPITAL REAL ESTATE FUND III LP, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____
(January 25, 2013)

Before HULL, MARCUS, and COX, Circuit Judges.

COX, Circuit Judge:

Plaintiffs-Appellants (the Buyers) each sought to own a piece of paradise. To that end, they purchased undeveloped lots in a planned resort in the Bahamas. Their purchase contracts contain a provision that requires all disputes to be litigated in the Bahamas. Many of the Buyers financed their purchases with mortgage loans made by Bahamas Sales Associate, LLC (Bahamas Sales), a mortgage lender.

Apparently the real estate market tanked sometime after the Buyers purchased their lots. And in May 2010, the Buyers (who had received mortgage financing to purchase the lots) sued Bahamas Sales and others associated with Bahamas Sales, alleging that they engaged in appraisal fraud. Additionally, all of the Buyers sued various Ginn entities and Lubert-Adler Management Company entities, alleging fraud related to a loan transaction that had a negative impact on the planned resort.

The Defendants-Appellees moved to dismiss the Buyers' complaint for improper venue, alleging that, under the purchase contracts, venue is proper only in the Bahamas. The district court held that the complaint falls within the scope of the forum-selection clause in the purchase contract. The court then applied the doctrine of equitable estoppel to allow the Defendants-Appellees (all of which are

2

nonsignatories to the contract containing the Bahamian forum-selection clause) to invoke the clause.  The Buyers appeal the dismissal.  We reverse and remand.

## I. Facts and Procedural History[1]

The Buyers[2] purchased lots in the Ginn Sur Mer subdivision on Grand Bahama Island in the Bahamas from Ginn-LA West End Limited (Ginn-LA).  The marketing materials promoting Ginn Sur Mer promised many amenities, including a twenty-story grand palace, two signature golf courses, and a mega-yacht marina.  Each Buyer entered into a purchase contract with Ginn-LA.[3]  Each contract contains a forum-selection clause and a choice-of-law clause that requires all disputes to be litigated in the Bahamas under Bahamian law.  Specifically, each forum-selection clause provides:

[1] The Buyers' complaint is the relevant pleading; because this appeal is before us at the motion to dismiss stage, our recitation of the facts comes from the complaint.  Additionally, because we treat a dismissal based on a forum-selection clause as a question of proper venue under Federal Rule of Civil Procedure 12(b)(3), *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290 (11th Cir. 1998), we also look to evidence outside the pleading, like the lot purchase contracts and the mortgage notes,  *Estate of Myhra v. Royal Caribbean Cruises, Ltd.*, 695 F.3d 1233, 1239 & n.22 (11th Cir. 2012).

[2] The Buyers are Mark F. Bailey, Gay L. Bailey, Stephen R. Brehahl, Andrea P. Bredahl, Kevin T. Crawford, David P. Jankowski, Troy A. Domnick, Lauren K. Domnick, James W. Jackson, Bernard J. Shaughnessy, Jr., Frederick A. Reeping, Beachfront Holdings & Investments, Ltd., Clear Reef Properties, Ltd., Edward R. Webb, Kenneth W. Liles, Patricia M. Liles, James Josephson, William J. Andrews, Jr., Mark R. Roodvoets, Jon D. Andrews, Charles B. Lesesne, Jerry A. Cicolani, Jr., Kris Brenneman, Susan C. Kherkher, Thomas E. Lammertsee, Mary L. Sipski, Ronald P. Van as trustee of the Ronald P. Van Jr. Revocable Trust, and Kathy Jo Van as trustee of the Kathy Jo Van Revocable Trust. (R.1-1 ¶¶ 5–19.)

[3] Some Buyers purchased lots individually, while others jointly purchased lots.  (R.1-1 ¶¶ 5–19.)

[T]he courts of the Commonwealth ("Commonwealth Courts") will be the venue for any dispute, proceeding, suit or legal action concerning the interpretation, construction, validity, enforcement, performance of, or related in any way to, this Contract or any other agreement or instrument executed in connection with this Contract. In the event any such suit or legal action is commenced by any party, the other parties agree, consent, and submit to the personal jurisdiction of the Commonwealth Courts with respect to such suit or legal action. In such event, each party waives any and all rights under applicable law or in equity to object to jurisdiction or venue of the Commonwealth Courts. Such jurisdiction and venue shall be exclusive of any other jurisdiction and venue.

(*See, e.g.*, R.1-8 Ex. A ¶ 22.) Each choice-of-law provision states: "The local laws of the Commonwealth, without regard to the Commonwealth's choice of law rules, will exclusively govern the interpretation, application, enforcement, performance of, and any other matter related to, this Contract." (*Id.*) Only the Buyers and Ginn-LA (the seller) signed the lot purchase contracts.

Many of the Buyers applied for and received mortgage financing from Bahamas Sales.[4] The mortgage notes also contain forum-selection clauses and choice-of-law clauses that each require disputes to be litigated in Florida under Florida law. The relevant clauses state:

---

[4] Mark F. Bailey, Gay L. Bailey, Stephen R. Bredahl, Andrea P. Bredahl, Kevin T. Crawford, David P. Jankowski, Troy A. Domnick, Lauren K. Domnick, James W. Jackson, Bernard J. Shaughnessy, Jr., Frederick A. Reeping, Clear Reef Properties, Ltd., and Beachfront Holdings & Investments, Ltd. received financing from Bahamas Sales. (R.1-1 at 145–146.)

4

> This Note and the rights and obligations of Borrower and Lender shall be governed by and interpreted in accordance with the law of the State of Florida. In any litigation in connection with or to enforce this Note or any endorsement or guaranty of this Note or any loan documents, obligors, and each of them, irrevocably consent to and confer personal jurisdiction on the courts of the State of Florida or the United States located within the State of Florida and expressly waive any objections as to venue in any such courts.

(*See, e.g.*, R.3-31 Ex. A ¶ 11.)  Only the Buyers and Bahamas Sales are parties to the mortgage notes.

In May 2010, the Buyers who received financing from Bahamas Sales sued Bahamas Sales, Ginn Financial Services (the parent company of Bahama Sales), Edward R. Ginn, III (an officer of Bahamas Sales), William McCracken (an officer of Ginn Financial Services)[5], and Ginn Title Services (together, the Mortgage Entities), alleging that the Mortgage Entities participated in a scheme to produce fraudulent lot appraisals in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968.  Specifically, the Buyers allege that the Mortgage Entities violated § 1962(c) and § 1962(d).  The complaint seeks rescission of the notes and mortgages and restitution of payments made on the notes.

---

[5] William McCracken was dismissed pursuant to a stipulation of dismissal.  (R. 4-41.)

The appraisal-fraud claims allege that the Mortgage Entities fraudulently inflated the appraisals of their lots and used the inflated appraisals to set the amounts on the mortgage notes.  Because of the inflated appraisals, the Buyers allege that they closed on the mortgage notes for amounts that far exceeded the market value of the lots.  The appraisal-fraud claims assume that if proper appraisals had been done and the lots appraised for amounts lower than their sales prices, the Buyers would not have closed on the lots.  Further, if proper appraisals had been done and the lots appraised for values less than their purchase prices, the Buyers claim that they could have simply walked away from the lot purchase contracts and paid only liquidated damages for their failure to close.

All of the Buyers also brought claims against other Ginn entities and Lubert-Adler Management Company entities (together, the Credit Suisse Entities)[6] alleging fraud related to a loan transaction (the Credit Suisse fraud).  The Buyers allege that the Credit Suisse Entities violated RICO § 1962(c) and § 1962(d).

---

[6] The Credit Suisse Entities are Lubert-Adler Management Company; Lubert-Adler Real Estate Fund III, LP; Lubert-Adler Real Estate Parallel Fund III, LP; Lubert-Adler Capital Real Estate Fund III, LP; Lubert-Adler Real Estate Fund IV, LP; Lubert-Adler Real Estate Parallel Fund IV, LP; Lubert-Adler Capital Real Estate Fund IV, LP; Lubert-Adler Real Estate Fund V, LP; Lubert-Adler Real Estate Parallel Fund V, LP; Lubert-Adler Capital Real Estate Fund V, LP; ERG Enterprises; Ginn West End; Ginn-LA West End LLLP; Ginn-LA CS Borrower; Ginn-LA Conduit Lender; and, Ginn-LA OBB.  (R.1-1 at 143–44.)

The Buyers' Credit Suisse fraud claims allege that before the Buyers signed the lot purchase contracts, the Credit Suisse Entities entered into an arrangement to obtain a $675 million loan from Credit Suisse, a financial-services company. The $675 million loan was secured by various ownership interests in the parent company of Ginn-LA (the Ginn Sur Mer developer) and the land from five Ginn resort communities, including the Ginn Sur Mer subdivision. The repayment schedule on the loan required that all of the cash flow produced by the five Ginn resort communities be used to pay the Credit Suisse loan. As a result, Ginn-LA could not complete the marketed, but not contractually required, amenities. The Buyers further allege that if they had known about the Credit Suisse loan, they would not have purchased the Ginn Sur Mer lots.

Rather than answering the Buyers' complaint, the Mortgage Entities and Credit Suisse Entities filed motions to dismiss asserting that venue is only proper in the Bahamas as specified under the forum-selection clauses in the lot purchase contracts. The district court agreed. The court held that the Buyers' claims fall within the scope of the lot purchase contracts' forum-selection clauses. It also held that the Mortgage Entities and Credit Suisse Entities, though not signatories to the lot purchase contracts, could nevertheless enforce the forum-selection clauses under the doctrine of equitable estoppel. We reverse and remand.

7

## II. Standards of Review

The enforceability of a forum-selection clause is a question of law that we review de novo. *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1329–30 (11th Cir. 2011). Further, whether the doctrine of equitable estoppel should apply is a question of law that we review de novo. *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993).

## III. Discussion

This appeal presents three issues: (A) whether Bahamas Sales agreed to venue in Florida under the mortgage notes; (B) whether the Buyers' appraisal-fraud claims and Credit Suisse fraud claims fall within the scope of the lot purchase contracts' forum-selection clauses; and (C) whether the Mortgage Entities and Credit Suisse Entities, as nonsignatories to the lot purchase contracts, can invoke the lot purchase contracts' forum-selection clauses. We address each issue in turn.

### A.

The Buyers argue that the mortgage notes' forum-selection clauses bind Bahamas Sales as a party to the notes. This argument is foreclosed by our recent decision in *Bahamas Sales Assoc., LLC v. Byers*, 11th Cir., ___ F.3d ___ (No. 11-11664, Dec. 4, 2012). In *Byers*, we held that the mortgage notes only bind

8

"obligors" under the notes, and Bahamas Sales is not an obligor because it is the party to which an obligation is owed.

## B.

The Buyers next argue that their appraisal-fraud claims and Credit Suisse fraud claims do not fall within the scope of the lot purchase contracts' forum-selection clauses.[7]    We look to the nature of each of the Buyers' claims to determine if the claim falls within the scope of the lot purchase contracts' forum-selection clauses. *Becker v. Davis*, 491 F.3d 1292, 1300 (11th Cir. 2007).

Both the Mortgage Entities and the Credit Suisse Entities contend that the Buyers' claims fall within the scope of the lot purchase contracts' forum-selection clauses.    Our decision in *Byers*, however, forecloses the Mortgage Entities' argument.    We held in *Byers* that the appraisal-fraud claims (identical to the appraisal-fraud claims in this case) do not fall within the scope of the forum-selection clauses.    As a result, we need only address whether the Credit Suisse fraud claims fall within the scope of the clauses.

The purchase contracts' forum-selection clauses state, in relevant part, that:

---

[7] In their brief, the Buyers simply argue that their claims do not relate to the lot purchase contracts and therefore that the district court erred by applying the "related to" analysis to the complaint.  The district court only applied this "related to" analysis when it concluded that the Buyers' appraisal-fraud claims and Credit Suisse fraud claims fall within the scope of the lot purchase contracts' forum-selection clauses.  Thus, we understand the Buyers' argument to be that their claims do not fall within the scope of the lot purchase contracts.

9

[T]he courts of the Commonwealth [of the Bahamas] . . . will be the venue for any dispute, proceeding, suit or legal action concerning the interpretation, construction, validity, enforcement, performance of, or related in any way to, [the lot purchase contract] or any other agreement or instrument executed in connection with [the lot purchase contract].

(*See, e.g.*, R.1-8 Ex. A ¶ 22.)  We must determine whether the Credit Suisse claims are "related in any way" to the lot purchase contracts or any other agreements executed in connection with the lot purchase contracts.

A claim "relates to" a contract when "the dispute occurs as a fairly direct result of the performance of contractual duties."  *Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001).  Moreover, the fact that a dispute could not have arisen but for an agreement does not mean that the dispute necessarily "relates to" that agreement.  *Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, 533 F.3d 1342, 1347 (11th Cir. 2008).  The phrase "'related to' marks a boundary indicating some direct relationship."  *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011).  Requiring a direct relationship between the claim and the contract is necessary because, "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, it would have no limiting purpose because really, universally, relations stop nowhere."  *Id.* at 1218–19 (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671, 1677 (1995)) (internal quotation marks omitted).

10

In this case, the district court concluded that the Credit Suisse claims fall within the scope of the lot purchase contracts' forum-selection clauses because (1) the Buyers' claims arise out of a relationship that was established by the lot purchase contracts, (2) the Buyers would not have any claims had they not entered into the lot purchase contracts, and (3) the Buyers' claims are similar to the claims in *Liles v. Ginn-LA West End, Ltd.*, where we held that the claims fell within the scope of the lot purchase contracts' forum-selection clauses, 631 F.3d 1242 (11th Cir. 2011).

For the Credit Suisse claims to fall within the scope of the purchase contracts' forum-selection clauses, the claims must have a direct relationship to the lot purchase contracts. They do not. The dispute between the Buyers and the Credit Suisse Entities is not a "fairly direct result of the performance of contractual duties" under the lot purchase contracts. *See Telecom Italia*, 248 F.3d at 1116. The Buyers do not allege that the Credit Suisse Entities interfered with Ginn-LA's performance obligations under the lot purchase contracts.

Moreover, the lot purchase contracts did not create the relationships between the parties. The only parties to the lot purchase contracts are the Buyers and Ginn-LA. The Buyers do not have a contractual relationship with any of the Credit Suisse Entities. And although the claims would not exist but for the Buyers

11

purchasing the Ginn Sur Mer lots, this but-for relationship does not mean that the claims relate to the lot purchase contracts. The claims must result from the performance of duties under the lot purchase contracts; the Credit Suisse claims do not. In fact, the Buyers would still be able to bring their Credit Suisse fraud claims even if Ginn-LA had performed all of its obligations under the lot purchase contracts.

Furthermore, although *Liles* involved the same lot purchase contracts at issue here, the Buyers' claims differ from the claims alleged in *Liles*. In *Liles*, the plaintiffs alleged that the defendants (including Ginn-LA) violated the Interstate Land Sales Full Disclosure Act and fraudulently failed to disclose information relating to the titles to the properties. 631 F.3d at 1243. These allegations directly related to the lot purchase contracts. The dispute in *Liles* occurred as a result of the defendants' alleged failure to perform various contractual duties, including the duty to adhere to the Interstate Land Sales Full Disclosure Act and the duty to provide marketable titles to the lots. The lot purchase contracts expressly incorporate both of those duties.[8] Here, as explained above, the Credit Suisse claims do not relate to the performance of duties under the lot purchase contracts.

---

[8] As we pointed out in *Liles*, the parties specifically incorporated the Interstate Land Sales Full Disclosure Act's obligations and rights into the lot purchase contracts. 631 F.3d at

12

The Credit Suisse Entities contend that the Credit Suisse fraud claims fall within the scope of the lot purchase contracts' forum-selection clauses because (1) claims of fraudulent inducement necessarily relate to the allegedly fraudulently induced contracts and (2) the Credit Suisse claims relate to "instruments executed in connection" with the lot purchase contracts.[9]

First, we reject the Credit Suisse Entities' argument that the Buyers allege fraudulent inducement of the lot purchase contracts and therefore that the claims relate to the contract. While we agree that claims of fraudulent inducement can relate to allegedly fraudulently induced contracts, *see Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S. Ct. 1801 (1967), the Buyers do not allege that the Credit Suisse Entities fraudulently induced them to enter into the lot purchase contracts. And actually, it would be a rather nonsensical claim for the Buyers to suggest that the Credit Suisse Entities—which they did not know existed until after they purchased their Ginn Sur Mer lots—fraudulently induced them to purchase the lots.

---

1252 n.17. Further, the lot purchase contracts obligate Ginn-LA to provide marketable title. (*See, e.g.*, R.1-8 Ex. A ¶¶ 2, 5.)

[9] The Credit Suisse Entities also argue that Credit Suisse fraud claims relate to the lot purchase contracts because the Buyers seek rescission of their lot purchase contracts. This argument is unconvincing, however, because the Buyers dropped their rescission claim. (R. 3-33 at 11.)

13

Second, the Credit Suisse Entities' argument that the Credit Suisse fraud claims fall within the scope of the forum-selection clauses because they are "related in any way to . . . any other agreement or instrument executed in connection with [the lot purchase contracts]" does not persuade us. The Credit Suisse claims have nothing to do with the mortgage notes, and the Buyers do not allege that the Credit Suisse fraud affected the notes. Instead, they allege that the Credit Suisse Entities used the Credit Suisse loan to "loot" the Ginn Sur Mer subdivision and, as a result, made it impossible for Ginn-LA to complete the marketed amenities to the subdivision.[10]

Because the Credit Suisse fraud claims do not have a direct relationship with the lot purchase contracts, the district court erred in concluding that the Credit Suisse fraud claims fall within the scope of the lot purchase contracts' forum-selection clauses.

## C.

Having concluded that the Buyers' appraisal-fraud and Credit Suisse fraud claims do not fall within the scope of the forum-selection clauses, we also address

---

[10] The Credit Suisse Entities argue that reading the phrase "related to" as requiring the dispute to occur as a direct result of the performance of contractual duties strips the phrase of its meaning. But this argument is contrary to our precedent that says a claim relates to a contract when a direct relationship between the claim and the performance of contractual duties exists. *See Triple I*, 533 F.3d at 1349; *Telecom Italia*, 248 F.3d at 1116.

14

the Buyers' final argument.  They argue that the district court incorrectly applied equitable estoppel to allow the Mortgage Entities and the Credit Suisse Entities to invoke the lot purchase contracts' forum-selection clauses.  The Buyers assert that their appraisal-fraud claims and Credit Suisse fraud claims do not rely on the lot purchase contracts and that, for this reason, the doctrine of equitable estoppel cannot properly be applied.

We hold in this case, as we held in *Byers*, that the district court erred in allowing the Mortgage Entities to invoke the lot purchase contracts' forum-selection clauses under the doctrine of equitable estoppel.  The Buyers' appraisal-fraud claims do not allege concerted misconduct between the Mortgage Entities and Ginn-LA.  Nor do the claims rely on the lot purchase contracts.

We write only to address whether the district court erred in applying equitable estoppel to allow the Credit Suisse Entities to enforce the forum-selection clauses.

First, we note that the parties litigated this case on the assumption that federal common law applies to the question of whether equitable estoppel should apply.[11]  All of the parties briefed and argued this case under federal common law

---

[11] The parties do not suggest that there is any significant difference between federal common law and Florida law concerning equitable estoppel.

15

as to the equitable estoppel issue.  Therefore, we assume that federal common law applies in this case.  *See Chase Manhattan Bank v. Rood*, 698 F.2d 435, 436 n.1 (11th Cir. 1983) (assuming Florida law is the applicable substantive law in the case because both parties briefed and argued Florida law on appeal).

Generally, "one who is not a party to an agreement cannot enforce its terms against one who is a party."  *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1167 (11th Cir. 2011).  There are, however, exceptions to this rule.  And the doctrine of equitable estoppel is one of them.

Equitable estoppel allows a nonsignatory to enforce the provisions of a contract against a signatory in two circumstances: (1) when the signatory to the contract relies on the terms of the contract to assert his or her claims against the nonsignatory and (2) when the signatory raises allegations of interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract.  *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999).  In essence, equitable estoppel precludes a party from claiming the benefits of some of the provisions of a contract while simultaneously attempting to avoid the burdens that some other provisions of the contract impose.  *Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005).  A forum-selection clause would be one such burden.

16

The doctrine of equitable estoppel is grounded in fairness. As we noted in *In re Humana Inc. Managed Care Litigation*:

> In all cases, the lynchpin for equitable estoppel is equity, and the point of applying it to compel [application of a contractual provision] is to prevent a situation that would fly in the face of fairness. The purpose of the doctrine is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from relying on the contract when it works to his advantage by establishing the claim, and repudiating it when it works to his disadvantage . . . . The plaintiff's actual depend[e]nce on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel.

285 F.3d 971, 976 (11th Cir. 2002) (citations omitted) (internal quotation marks omitted), *rev'd on other grounds sub nom. PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 123 S. Ct. 1531 (2003).

The Buyers' complaint does not allege concerted misconduct between the Credit Suisse Entities and Ginn-LA (the developer and signatory to the lot purchase contracts). Nevertheless, the Credit Suisse Entities argue that the concerted-misconduct circumstance applies here because the Credit Suisse fraud claims depend on conduct between the Credit Suisse Entities and Ginn-LA. That is, the Credit Suisse Entities assert that Ginn-LA's sale of the Ginn Sur Mer lots was a "necessary component" of the Credit Suisse scheme. According to the Credit Suisse Entities, the fact that Ginn-LA entered into lot purchase contracts

17

with the Buyers "is fundamental to and inextricably connected with" the Credit Suisse Entities' conduct in the Credit Suisse fraud.

We have noted, however, that the application of equitable estoppel is appropriate when the signatory "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *MS Dealer*, 177 F.3d at 947. The Buyers neither allege concerted misconduct between the Credit Suisse Entities and Ginn-LA in their complaint nor name Ginn-LA as a party to this action.[12] Thus, the Credit Suisse Entities must look only to the first circumstance in which the doctrine of equitable estoppel applies. We therefore limit our inquiry to that circumstance—

---

[12] The Credit Suisse Entities assert that simply because the Buyers did not name Ginn-LA as a party does not mean that the Buyers do not allege concerted misconduct. The Entities cite *Choctaw Generation Ltd. v. Am. Home Assurance Co.*, 271 F.3d 403 (2d Cir. 2001), for the proposition that nonsignatory defendants can invoke a contractual clause under the concerted-misconduct prong of *MS Dealer* even when the plaintiff does not name a signatory as a defendant. But a close reading of *Choctaw* reveals no such proposition. In *Choctaw*, the court concluded that the defendant could enforce an arbitration clause in a contract it did not sign because the plaintiff's claims "are intertwined with the agreement." *Id.* at 404. The Second Circuit, applying an analysis that looked to whether the plaintiff's claims related to the dispute between the two signatories to the contract, determined that the nonsignatory defendant could enforce the provision under the doctrine of equitable estoppel. *Id.* at 406–08. *Choctaw* tells us very little about whether a plaintiff alleges concerted misconduct when the plaintiff does not allege misconduct between the nonsignatories and the signatory in the complaint and does not name the signatory as a party. Because the Buyers do not name Ginn-LA as a party and do not allege that the Credit Suisse Entities acted in concert with Ginn-LA to engage in the Credit Suisse fraud, the second circumstance in which equitable estoppel applies is not implicated.

18

whether the Buyers rely on the terms of the lot purchase contracts in asserting their Credit Suisse fraud claims.

A party relies on the terms of a contract when the party needs the underlying contract to make out his or her claim against the nonsignatory. *In re Humana*, 285 F.3d at 976. The signatory must attempt to hold the nonsignatory to the terms of the contract. *Becker*, 491 F.3d at 1300.

A but-for relationship between the claims and the contract "alone is not enough to warrant equitable estoppel." *Lawson*, 648 F.3d at 1174. For a party's claims to rely on a contract, the party must actually depend on the underlying contract to assert the claims. *In re Humana*, 285 F.3d at 976. A simple but-for relationship does not constitute the actual dependence on the underlying contract that equitable estoppel requires. Scant authority exists that deals with this precise issue. Our view, however, comports with the view of two of our sister circuits. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011) (per curiam) ("For a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them."); *Brantley v. Republic Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005) ("The district court correctly found that the

19

mere existence of a loan transaction requiring plaintiffs to obtain mortgage insurance cannot be the basis for finding their federal statutory claims . . . to be intertwined with that contract."). And the parties cite no precedent to the contrary.

Because the application of equitable estoppel is not a "rigid test, and each case turns on its facts," *In re Humana*, 285 F.3d at 976, we now turn to the facts of this case.

The Buyers allege that the Credit Suisse Entities fraudulently concealed the $675 million dollar loan from them. They allege that the Credit Suisse Entities "looted" the Ginn Sur Mer subdivision when the Credit Suisse Entities entered into the Credit Suisse loan and used the Ginn Sur Mer subdivision as collateral. As a result of the scheme, they allege that Ginn-LA could not complete the marketed amenities. This loan and the allegedly fraudulent scheme took place before any of the Buyers purchased their lots.

The Credit Suisse Entities argue that the Credit Suisse claims rely on the lot purchase contracts because if the Buyers had not entered into the purchase contracts, they would not have suffered damages from the alleged fraud.[13] As

---

[13] The Entities also argue that the claims rely on the lot purchase contracts because the Buyers seek rescission of the lot purchase contracts. But the Buyers do not seek rescission of the lot purchase contracts. They dropped their request for rescission on September 13, 2010. (R.3-33 at 11.)

previously noted, however, a but-for relationship between the lot purchase contracts and the claims is not enough to warrant the application of equitable estoppel.

The Credit Suisse Entities further contend that *Liles* forecloses the Buyers' argument that the claims do not rely on the lot purchase contracts. 631 F.3d at 1243. But *Liles* is distinguishable. As we said in *Byers*, the plaintiffs in *Liles* relied on the lot purchase contracts to make out their claims and therefore the court correctly applied equitable estoppel to allow the nonsignatories to invoke the forum-selection clauses. Without the lot purchase contracts, the plaintiffs would have been unable to bring their claims.

Here, the Buyers' Credit Suisse fraud claims do not rely on the lot purchase contracts. The Buyers do not seek to hold the Credit Suisse Entities to the terms of the lot purchase contracts. The Buyers simply allege that they could not benefit from the marketed amenities (which are not required under the lot purchase contracts) because of the Credit Suisse fraud. Additionally, the Buyers do not rely on any terms of the lot purchase contracts to establish the liability of the Credit Suisse Entities. It would be rather puzzling to say that the Credit Suisse fraud claims rely on the lot purchase contracts when the alleged fraud occurred before any of the Buyers purchased their lots.

21

Because the Credit Suisse fraud claims do not rely on the lot purchase contracts, we hold that the district court erred in applying the doctrine of equitable estoppel to allow the Credit Suisse Entities to invoke the lot purchase contracts' forum-selection clauses.

## IV. Conclusion[14]

For these reasons, we hold that the district court erred when it determined that the Buyers' claims fall within the scope of the lot purchase contracts' forum-selection clauses.  We also hold that the court erred in applying equitable estoppel to allow the Mortgage Entities and the Credit Suisse Entities (nonsignatories to the lot purchase contracts) to invoke the lot purchase contracts' forum-selection clauses.  Accordingly, we reverse the district court's judgment granting the motions to dismiss for improper venue and remand for proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

[14] The Lubert-Adler entities (some of the Credit Suisse Entities) argue that the Buyers failed to satisfy the pleading requirements for their RICO claims in violation of Federal Rule of Civil Procedure 9(b).  Additionally, they argue that the Buyers have failed to assert facts showing that Lubert-Adler's actions proximately caused the Buyers' harm.  Because the district court has not addressed these issues, we prefer to leave them to the district court to address in the first instance.

Finally, to the extent that the Ginn entities argue that the Buyers failed to properly plead their RICO claims, we decline to address the argument because the district court has not yet ruled on the issue.  Again, we prefer to leave the issue for the district court.